WINTER H. HOLLEY *vs*. THE WINOOSKIE TURNPIKE COMPANY.

See Acts of
1805, ch. 91.

In 1805, the legislature of Vermont passed an act, entitled "An act, incorporating certain Turnpike Companies in the Western Counties in this State," containing, among others, the following provision: "*That each corporation shall be liable to pay all damages which may happen to any person, from whom toll is demandable, which may arise from neglect of any bridge, &c. within their respective limits, after the same has been made and approved,* &c.

Held—That where one of said companies, having erected a long and high bridge with railings, afterwards permitted the same to be travelled, with no other muniments on the sides than a line of timbers eighteen inches square, it was a neglect of said bridge, within the meaning of the act.

Held, also, that where, from the extraordinary fright of a horse, from a cause not chargeable to the corporation, it is doubtful whether a common railing would have restrained him from going off said bridge; still, as the corporation were guilty of neglect, they were answerable for the loss occasioned by his running off the side of said bridge.

THIS was an action upon the case, brought under the statute, to recover the damages sustained in the loss of a horse, killed in falling from the bridge erected by the Winooskie Turnpike Company, upon their road, over Onion river, in Waterbury.

At the January term of this Court, 1825, there was a trial and verdict for the defendants; whereupon, exceptions being taken,

the parties entered into a rule, to abide the judgment of the Court, upon the following *case stated.*

On the trial of the issue in the above cause, the following facts appeared in evidence, *to wit.* That in the month of February, 1822, the plaintiff's brother was travelling with his wife and child, on the Winooskie turnpike road, on which he had paid the usual toll, in a one horse sleigh, drawn by the horse in question; the same horse being the property of the plaintiff, and coming to the Onion river bridge, in Waterbury, on the said turnpike road, drove on the same, immediately in the rear of a sleigh which was passing in the same direction, which sleigh had a bureau, or organ, in it, covered with a blanket: that just as the cutter, or one horse sleigh, entered on the bridge, the wind threw up the blanket which covered the bureau or organ, which was supposed to have frightened the plaintiff's horse, as said horse refused to proceed, and inclined to the right; that the plaintiff's brother, who was driving said horse, perceiving him to be frightened, reined him up, without effect; that the horse threw himself to the right, against a string piece, or stick of timber, which lay upon the side of the bridge as a muniment; (which said string piece, or stick of timber, was placed upon the planks or floor of the bridge, and was 18 inches square,) and went over, taking the cutter, or one horse sleigh, with him, and fell from the bridge to the river below: and in the fall received wounds of which he soon after died: that the plaintiff's brother, who was in the cutter, or one horse sleigh, escaped from the cutter, or one horse sleigh, on one side of the same, and the woman and child on the other, before the same went off the bridge—that when the bridge was first erected and accepted, there was a railing on the said timbers or string pieces, and that the same had decayed, and either fallen down or been removed, and had not been replaced; and that said bridge had remained since 1815, and until the accident happened, without any other muniment on the sides of said bridge, than the string pieces abovementioned.

It is agreed by the parties, that if, from the above statement of facts, the Court shall be of opinion, that the plaintiff ought to recover, the verdict to be set aside, and a verdict entered for the plaintiff for $83,34, and interest since judgment in the county court, otherwise, the verdict to remain.

*S. S. Phelps*, for defendants.

*Chipman, Seymour*, and *Holley*, for plaintiff.

*Bates*, for the plaintiff. It is not insisted by the plaintiff in this case, that by the act of incorporation, the company are made liable to pay all damages which may be sustained by travellers on their road, nor all damages which would not have been sustained, had the road been made and guarded in the best conceivable manner. Such is not the meaning of the act.

*Addison,*
January,
1826.

Holley
*vs.*
The Winooskie Turnpike
Company.

*Addison,*
January,
1826.

Holley
*vs.*
The Winoos-
kie Turnpike
Company.
The company are not bound to make a railing on each side of the road, so that a horse could by no possibility run off it, nor is it necessary for the plaintiff to insist that the company are holden to pay all damages occasioned by a defect in the road, or bridges, whether known to the company or not, and for which the company can be chargeable with no real neglect. This question, however, has been decided by this Court, as it relates to the liability of towns. Towns are made liable for all damages occasioned by a want of repairs in their roads, as are this company by the act of incorporation. The courts have given to this provision of the act a liberal construction, as being most consistent with the principles of policy, as well as of justice, that the loss should, in all cases, be thrown upon the town, whose duty it is to see that their roads are in repair, rather than upon the traveller; although it appear that the town has been guilty of no real neglect. Suppose the same railing which was put upon the bridge when first erected, had continued on the bridge, and was standing at the time the plaintiff attempted to cross it, but had become so rotten as easily to give way, and let the horse into the river: according to the principles settled as to the liability of towns, the company would have been liable. But this is not the present case. When this bridge was first erected by the company, such was the height and length of it, that they considered it necessary to erect a substantial railing on each side of the bridge, to render it safer for travellers. Still, if they were not bound by the act of incorporation, to erect it, they can be rendered liable for suffering it to go to decay, and the bridge to remain without a railing; but the single question which this case presents is, was a railing on this bridge, considering its height and length, over a rapid stream, necessary to render it reasonably safe for travellers in passing it? and, consequently, a want of such railing, a want of repair, within the meaning of the act? If it was not, it must necessarily follow, that no turnpike company is bound to erect a railing on any bridge whatever, for no bridge in the state can be more dangerous without one. It will be seen too, that on precisely the same principle, every town must be discharged from erecting or continuing a railing on any of their bridges: consequently, no damages can be recovered, as having been sustained merely for the want of such railing; but, if a traveller have the misfortune to run off of a bridge, and sustain damages, and commence an action to recover them, his action must be decided on its own circumstances. That is, on the character and disposition of the horse, on the ability of the defendant to pay, and on other circumstances of like importance and uncertainty. If wise, he would prefer the loss of another horse to a prosecution of such an action. On the other hand, if it be settled, that the company are bound to keep a railing on their bridge, to render it reasonably safe for travellers, and, in case of neglect, are liable for all damages which they may sustain by running off of it, it will furnish a rule certain and easy in its application, as far as it extends;

and it is no objection to the rule, that it will leave a great variety of cases, in relation to damages sustained by turnpikes, unsettled, and many of them difficult and perplexing. It must be unnecessary to recur to authorities to establish the principle, that the company, in this case, were bound by the act of incorporation to keep the bridge in such a situation, that travellers might pass it with reasonable security; and to decide the question, whether the bridge could afford such security without a railing, it must be useless to recur to any decisions, except those of our own courts; and I know of none made by *this* Court, except in the analogous cases relating to town bridges. In those cases, it has been decided, that towns are bound to keep railings on their bridges, and are liable to pay all damages occasioned by the want of such railings. It was so decided in the case of *Bliss* vs. *Middlebury*: and for a decision of the question, whether this bridge was in good repair, within the meaning of the act, it must be not only useless, but improper, to refer to cases decided in other states, and other countries. The construction, or, rather, the effect of such act, in such state, must depend in some measure, on the general state of the roads and bridges. Such bridge, without a railing, might, in one country, be considered reasonably safe within the meaning of such act, which, in another, would be deemed unsafe, and dangerous in the extreme. We refer, then, to the decisions of this Court in relation to town bridges in this state, at the time when the company was incorporated, and ever since, to show, conclusively, that a railing was required on this bridge, to render it reasonably safe within the meaning of the act, and to establish the principle, that every town, turnpike company, or other corporation, whose duty it is to keep their bridges in good repair, are bound by law. to keep and maintain a railing on all bridges, of such height, as that a fall from them must endanger the life of man and beast. Farther than this, it is unnecessary to go, in this case; for it will be admitted, that such was the situation of this bridge. But it has been said, in this case, and with some effect, that the damages were not sustained by reason of any defect, or want of repairs, in the bridge; but were occasioned by the unreasonable fears and ungovernable temper of the horse; and that it was the cloak, or blanket, accidentally, and without any fault of the defendant, raised by the wind, which frightened the horse, and threw him from the bridge. This is literally throwing the case *in the wind*; and it is taking a ground, which, if sustained, must, in every possible case of this kind, afford a certain defence. It is this, if the horse had not been frightened, he would, of course, have gone quietly and safely over the bridge, and could not have fallen off; and even if frightened, he might have been kept on the bridge by the driver, if perfectly manageable. The company could, therefore, be liable only in the case where the horse calmly and deliberately walked off the bridge into the river; nor even in that case, for the loss would, with some reason, be ascribed to the carelessness of the driver. It is difficult to state

*Addison,*
January.
1826.

Holley
*vs.*
The Winoos-
kie Turnpike
Company.

*Addison,*
January,
1826.

Holley
*vs.*
The Winoos-
kie Turnpike
Company.

such arguments, or to answer them, without appearing to trifle with the subject. Railings on bridges are not required for the security of those travellers who are so fortunate as to drive horses at all times, and in all places, perfectly quiet and manageable. They can be of no possible use to such travellers, but solely for the security of the far more numerous class who travel with horses more or less apt to take fright, and become unmanageable on a bridge; and if this class of travellers are not entitled to damages, sustained for the want of such railing, none can, in any case, be recovered of the company. To admit, that a horse's being frightened, would excuse the liability, is to do away the liability altogether. This horse was not peculiarly vicious—was such as are usually used in travelling our publick roads. It is the nature of the animal, however safe and orderly, to be inclined to *sheer*, and to take fright upon bridges; and it is this general nature and disposition of the animal, that is the foundation of the obligation of the company to provide the security of side railings to their bridges, that the traveller may have their security, in case his horse takes fright, in a situation where he is much inclined to. If the horse does not take fright, or incline to *sheer* off, the traveller does not need the side railing.

The eleventh section of the act incorporating this company, provides, that the charter of the road shall be void, if the company shall not have completed the same, to the acceptance of the judges of the supreme court, or a committee to be by them appointed, within a certain time, &c. The 5th section provides, "That each corporation shall be liable to pay all damages which may happen to any person, from whom toll is demandable, which may arise from neglect of any bridge, or want of repairs on said road, within their respective limits, after the same has been made and approved."

By this *case stated*, it appears, that when the bridge was erected and *accepted*, there was a railing on the sides of the bridge, which, at the time of the injury, had decayed, and had fallen down, or was removed: had such a railing been there, the injury would not have happened. The neglect of the company in this respect, is within both the letter and spirit of the 5th section. It is precisely "the neglect of a bridge," after *approved*, there described; and by the plain letter and meaning of the law, the liability is on the company. A different construction would render the provisions of the statute altogether nugatory.

It has also been said, in defence, in this case, that the company are unable to maintain railings on all their bridges—that the toll would not pay the expence, and they must be compelled to abandon their road. Be it so. This cannot deprive the plaintiff of his right to recover those damages to which he is by law entitled, whatever weight it might have with a grand jury, as between the publick and the company.

*Phelps*, for the defendants. The gentleman has certainly put the case on new ground—that of keeping the *road* in *statu quo*.

The legislature have not placed the liability on that ground; but, on the ground that they are bound to keep the road in good repair, according to the ordinary judgments of men.

*Addison,*
*January,*
*1826.*

[Holley
*vs.*
The Winoos-
kie Turnpike
Company.

The defendants are not liable, in this case; for they are bound only to ordinary care and diligence, in the construction of their road and bridges.—*Townsend* vs. *the Susquehannah T. P. Comp.* 6 *Johns.* 90.

They are not insurers, and receive no compensation as such. It is sufficient, therefore, if they render their roads safe for those who travel with manageable horses, and observe proper caution.

To render them liable, it should appear that the injury arose *principally,* if not *purely,* from the insufficiency of the bridge.

But in this case, the bridge was sufficient. A stick of timber eighteen inches square, is a sufficient muniment for all ordinary occasions. The injury, in this case, is not attributable to any deficiency in the bridge. It originated purely in 'accident, if the driver's accidentally, or, perhaps, heedlessly, pressing upon the sleigh before him, and the fortuitous motion of the blanket, produced the injury; and these were occurrences over which the defendants had no control.

Besides, the injury would not have happened, had the horse been manageable. The driver had sufficient notice of the danger, to use measures to prevent the injury; and there was sufficient time, after these were found unavailing, for the driver, the woman, and child, to clear themselves from the cutter.

In short, a skittish horse accidentally takes fright at an object passing in the road, becomes unmanageable, forces himself out of the road, and sustains an injury.

To require the defendants to provide means against *such* accidents, whenever they may occur, would be extending their liability beyond all reasonable bounds.

It may be said, that the sides of the bridge might have been so defended, that the horse could not have got over. This is true—but, it is sufficient for our purpose, if the bridge was safe, provided the driver could have controled his horse. Every man runs his own risk, as to the character of the horse he drives, and his own risk as to accidents, which render a horse, not ordinarily skittish, restive and unmanageable.

*Chipman,* for the plaintiff, in reply, contended, that these companies are placed on the same footing as towns; and cited the cases of *Hawkins* vs. *New Haven,* and *Bliss* vs. *Middlebury.* The Court, he said, gave the act, in those cases, a literal construction, making the towns a sort of insurer to the traveller.

Royce, J. delivered the opinion of the Court.

Two questions are presented by this case, as stated and submitted by the parties; first, whether the bridge was out of repair: and, secondly, if it was, whether the loss sustained by the plaintiff is attributable to the deficiency of the bridge. That the grounds of our opinion might appear more distinctly on the record, the case should have given the dimensions of the bridge;

*Addison,*
*January,*
*1826.*

but as it does not, and the cause has proceeded without objection on that account, we shall act upon our knowledge of the facts omitted, as if they appeared in the case.

*Holley*
*vs.*
*The Winoos-*
*kie Turnpike*
*Company.*

It is the opinion of the Court, that the side timbers on this bridge, at the time of the accident in question, were not alone sufficient for the reasonable safety of travellers; but that, upon this bridge, as upon all other elevated and lengthy bridges, an additional security is necessary. As accidents are more likely to happen upon such bridges than elsewhere, and as their consequences are more to be dreaded, they should be provided for with greater care. Railings, in this instance, were required, not merely to resist the force of the horse when terrified and unmanageable, but chiefly to guide the eye of the animal, and give it a sense of confinement within them. It is also worthy of notice, that when this bridge was erected by the defendants, and accepted by authority, railings were made upon it. And it is to be presumed, that they were not added for ornament, but from a supposed necessity; and, if necessary at one time, they must be equally so at all times.

The other question is more doubtful, since the affright of the horse proceeded from a cause not chargeable to the defendants; and when affrighted, he might have broken through such a railing as the defendants ought to have provided. As it is uncertain, however, what influence such railings might have had in preventing an attempt of the horse to escape, in that direction, from the object of its alarm, we think it best to solve this doubt against the party in fault. It must, therefore, be considered that the defendants were guilty of neglect, and that the loss of the plaintiff was occasioned by it.

Judgment, for the plaintiff, according to the rule.

*Daniel Chipman, R. B. Bates, and Seymour & Holley,* attornies for the plaintiff.

*Samuel S. Phelps,* attorney for the defendants.